Hiram C. CLEVENGER, Appellant,

v.

LIBERTY MUTUAL INSURANCE COM-
PANY, Appellee.

No. 16600.

Court of Civil Appeals of Texas.

Dallas.

Oct. 22, 1965.

Rehearing Denied Nov. 19, 1965.

Charles Ben Howell, Dallas, for appellant.

Gordon H. Rowe, Jr., Leachman, Gardere, Akin, Porter & DeHay, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

This is a workmen's compensation case. Hiram C. Clevenger, an automobile salesman for McAllister Mercury-Comet, Inc., sustained personal injuries while playing baseball at a company-sponsored picnic or outing. He sought to recover workmen's compensation benefits alleging that his injuries were sustained while he was in the course and scope of his employment for his employer which carried workmen's compensation insurance with Liberty Mutual Insurance Company. The case was tried before the court and a jury in the district court but the jury was unable to agree upon the answer to the special issue inquiring whether Clevenger sustained his injuries while in the course and scope of his employment. The jury was discharged (but no mistrial ordered) and thereafter plaintiff filed a motion for summary judgment and defendant Liberty Mutual Insurance Company moved the court to enter judgment in its favor, re-urging its motion for instructed verdict made at the close of the evidence. The trial court overruled plaintiff's motion for summary judgment and sustained defendant's motions thereby holding, as a matter of law, that plaintiff was not within the course and scope of his employment at the time of his accidental injuries and that he should be denied recovery.[1]

---

1. "Thereupon, the plaintiff filed his Motion for Separate Trial and Summary Judgment and thereupon the defendant moved the Court to enter judgment for the defendant to the effect that Plaintiff take nothing and that the defendant have its costs by reason of there being no issue raised in the case with respect to course of employment and the Court having heard such motions as well as having reconsidered the motion for an instructed verdict which was made after both sides closed, the Court is of the opinion that defendant's position is well taken and

In his first point of error appellant contends that the trial court erred in sustaining appellee's motion for instructed verdict since such motion did not comply with the procedural requirements of Rule 268, Texas Rules of Civil Procedure by failing to contain specific grounds therefor. At the conclusion of appellant's testimony during the trial appellee filed its written motion for instructed verdict, such motion being couched in general terms relating to the issue of benefits accruing to the employer by virtue of the picnic. At the conclusion of all of the testimony the same motion was filed but not ruled upon. After the jury had announced that it was unable to render a complete verdict, and was especially unable to answer the question on the course and scope of employment, the trial judge dismissed the jury but did not enter an order of mistrial. Subsequently appellee filed another motion for instructed verdict which contained specific grounds directed to the question of scope of employment. Appellee also filed its motion for judgment predicated upon the proposition that appellant was not in the course and scope of his employment, as a matter of law. The court sustained appellee's motions.

■ It is well established in Texas that where a jury is unable to agree upon a verdict and has been discharged, but no order of mistrial has been entered, that the trial judge may reconsider a motion for instructed verdict and act upon the same. Slay v. Mary Couts Burnett Trust, 143 Tex. 621, 187 S.W.2d 377; Clark v. Jones, Tex.Civ.App., 164 S.W.2d 62; First Nat'l Bank in Graham v. Corbin, Tex.Civ.App., 153 S.W.2d 979; Fitts v. Carpenter, Tex.Civ.App., 124 S.W.2d 420; Peveto v. Herring, Tex. Civ.App., 198 S.W.2d 921; Whisenant v. Fidelity & Casualty Co. of New York, Tex. Civ.App., 354 S.W.2d 683. One court has held that the trial judge may act upon a motion for instructed verdict which was not made until after the jury had been discharged for failure to agree upon the verdict. Rockett v. Texas State Board of Medical Examiners, Tex.Civ.App., 287 S. W.2d 190.

■ The fact that the first two motions for instructed verdict filed by appellee did not strictly comply with Rule 268, T.R.C.P. by not being specific enough in its grounds, does not defeat the trial court's action. In the first place, appellant made no objection to the generality in specifying grounds contained in the motions and therefore may be said to have waived any objection thereto. Routte v. Guarino, Tex.Civ. App., 216 S.W.2d 607; Baylor v. Eastern Seed Co., Tex.Civ.App., 191 S.W.2d 689. Even so, it has been repeatedly said that the requirement of Rule 268, T.R.C.P. dealing with "the specific grounds therefor" is for the benefit of the trial court and the party opposing the motion has been held not to be in a position to complain on appeal because of failure to properly inform the court as to the reasons why the motion should be granted. The basis for this rule is that the trial court has general authority to withdraw a case from a jury and grant judgment on its own motion where the evidence does not warrant submission of any appropriate issues to the jury. Marlin Associates v. Trinity Universal Ins. Co., Tex.Civ. App., 226 S.W.2d 190; Baylor v. Eastern Seed Co., supra; Rockett v. Texas State Board of Medical Examiners, supra. Appellant's first point of error is overruled.

Appellant's Points 2, 3 and 4 assail the court's action in sustaining appellee's mo-

---

plaintiff's position is not well taken and that defendant is entitled to judgment as a matter of law on the ground that plaintiff was not within the course and scope of his employment at the time of his accidental injury concerned herein and that a judgment should be entered herein denying plaintiff's motion for separate trial and summary judgment and denying plaintiff any recovery in said cause and that all costs herein incurred be taxed against the plaintiff, and it is so ordered.

"It is therefore ordered, decreed and adjudged that the plaintiff, Hiram C. Clevenger, take nothing of and from the defendant, Liberty Mutual Insurance Company."

tion for an instructed verdict and holding, as a matter of law, that under the facts presented by the record appellant was not acting within the course and scope of his employment for his employer at the time he sustained his accidental personal injuries. Appellant argues that there was sufficient probative evidence in the record to justify the submission of the issue to the jury and that, the jury having failed to agree upon such issue, an order of mistrial should have been granted.

In reviewing the propriety of the trial court's action in granting the motion for instructed verdict our duty is to examine all of the testimony in the case that is relevant to the issue of course and scope of employment and consider the evidence in the light most favorable to the appellant, disregarding all conflicts and indulging in every intendment reasonably deducible from the evidence in favor of the appellant. 4 Tex.Jur.2d, § 835. Only if the evidence presented is of such a conclusive character that reasonable minds could not differ as to its effect and only one conclusion may reasonably be drawn from it, the question becomes one of law, thereby justifying the granting of the instructed verdict. 56 Tex.Jur.2d, § 212, p. 553; 3 McDonald, Texas Civil Practice, § 11.28.

To comply with these rules we have carefully read and studied the entire statement of facts. We deem it desirable and appropriate to set forth essential portions of the testimony relating to the issue of course and scope of employment.

In September 1962 Clevenger was employed by McAllister Mercury-Comet, Inc. as an automobile salesman. His duties were to sell both new and used automobiles for which he received a $400 a month guarantee and twenty-five per cent of the net profit. His supervisors were Mr. McAllister, Mr. Gregory, the used car manager, and Mr. Chapman, the assistant used car manager. About a week before the company picnic was to be held he received notice of the picnic in a bulletin put out by the com-

pany. This bulletin, Plaintiff's Exhibit 1, announced that a company picnic for all employees and their immediate families would be held on Sunday afternoon, September 23rd, at Sandy Lake Lodge, Carrollton, Texas, and that a softball game would be played between the parts and service departments and the sales department. It said: "Let's all go to the picnic and have a lot of fun!" When asked whether the bulletin, Exhibit 1, was the only notice of the picnic that he had, Clevenger testified:

"Q. What other notice did you have?

"A. From my sales managers, and they asked us to go.

"Q. Who were they?

"A. Mr. Gregory and Mr. Chapman.

"Q. All right, sir. Did they talk to you, personally, about it?

"A. Yes, sir.

"Q. Now, when was this?

"A. Well, I would say they talked to me some about it every day that week.

"Q. The week before the picnic?

"A. Yes, sir.

"Q. What conversation did they have with you, relative to this picnic?

"A. Well, they were encouraging us to all go; they wanted 100 per cent of the company there: and they told us that they really expected us to be there.

"Q. They expected you to be there?

"A. Yes, sir."

Clevenger testified that selling automobiles is a highly competitive business. He described the sales and sales training policies of his employer as being "aggressive". He said that they were much more aggressive than most dealers. As an example he cited the instance of the "bird dog plan" which meant that anyone from janitor on

up who tipped off a salesman concerning the sale of a new car would be given ten or fifteen dollars. His company also had promotional deals going all the time such as bonuses and prizes for salesmen and that the "salesman of the month" would receive a hundred dollar suit of clothes or alligator shoes. Each morning the company had sales meetings and some were held at the Holiday Inn, Eastern Hills or other motels. The theme of all of these meetings was to produce more business and to sell more cars. He said that the salesmen were required to attend these off-premises sales meetings. When asked why the company held the picnic on Sunday he replied: "That was the only day they could have 100 per cent there." Further, he testified that Mr. Gregory and Mr. Chapman discussed the picnic with him and let him know that they wanted to see him there. He drove to the picnic in a company car using company gasoline and arrived between 11:30 and 12:00 o'clock. The picnic grounds at Sandy Lake had been reserved by the company and was supposed to be for no one except employees of the company together with their families or close friends. When he got inside the picnic grounds he found that the company had a new model Monterey Mercury automobile on display just inside the gate to the picnic grounds and under a little shed. This was the beginning of the new model cars for the year and they had not been shown to the public. When asked to tell about the new model automobile he testified:

"Q. Now, tell us how they had that set up and displayed?

"A. They had the car parked there, and I believe all four doors were open, and the trunk; and I am not sure about the hood being open.

"Q. All right.

"A. And, of course, it had the new car stickers in the windows, and different little plaques sticking on the car, explaining the new features of it.

"Q. What do you mean, 'little plaques'? What does—

"A. They were the type that you just—They are kind of magnetized, and will stick to the car.

"Q. All right.

"A. That was the thing that really caught my eyes, because that is the first ones I had seen like that.

"Q. All right. Well, what did these little plaques say, generally, the ones that you saw?

"A. Oh, they were—

"Q. Or, what were they telling about?

"A. Oh, they were explaining the new features of the car, the material that the car was made out of, this new back window. They were explaining that. And, I believe, there was one on the grille, telling what kind of material that the car was made from.

"Q. Well, about how many of those plaques? I know you can't say exactly, but, were there just a few of them on there?

"A. I would say that there were a dozen on it.

"Q. Okay. At the various points?

"A. Yes, sir.

"Q. Explaining the new features of that new car?

"A. Yes, sir.

"Q. All right. And, had that car ever been shown to the public?

"A. No, sir.

"Q. It hadn't—Had you seen one like that one, before?

"A. Yes, sir, I saw one, at the dealers showing, in the Auditorium, here.

"Q. What about the other salesmen out there, so far as you know? Had they see it?

"A. Part of them had, and part of them had not.

"Q. Several of them had never seen one like that, at all, is that right?

"A. No, sir. I am sure that the service department had not seen too much of the car.

"Q. I beg your pardon?

"A. I am reasonably sure that the service department, and office staff, had not seen too much of the car."

He said he stopped and looked at the new automobile and especially the signs and plaques that they had on it. He especially checked out the rear window which apparently was different from other models. After looking at the new automobile he went to the ball park where people were playing softball. Mr. Chapman took him by the arm and wanted him to get into the ball game. He was not particularly interested in playing, having worked all week, but he figured if the boss wanted him to do it, "It is just kind of best to do it." He played second base and when a ball was hit towards him he ran to catch it and stepped in a low place on the playing field and injured his knee. He became ill due to the pain and his leg started swelling up. He drove home and called a doctor.

On cross-examination Clevenger stated that they "talked about the car, and probably have a good year; and where they were going to go."

A portion of Clevenger's deposition was read, including the following:

"Q. (Mr. McKnight) 'Question: And he was telling you and the other men that he thought it was a real selling feature?

'Answer: Yes, sir.

'Question: And he wanted you to push it?

'Answer: Yes, sir.

'Question: How about the new car sales managers? Did you have any discussions with them, along the same line?

'Answer: Yes, sir.'

"THE COURT: Are you talking about out at the picnic?

"MR. McKNIGHT: Yes, sir. That is where it is.

"THE COURT: All right.

"Q. (By Mr. McKnight) 'Question: And all those—these all took place right up there in front of the new car?

'Answer: Yes, sir, saying that the big window was—the big window was the big issue on the car, and they were trying to sell it—sell it to the salesmen, of course, that it was a good thing.' "

Again on cross-examination, Clevenger testified:

"Q. All right. Now, Mr. Clevenger, you are not telling the Jury that anybody made you go out to the picnic that day, are you?

"A. No, sir.

"Q. I mean, you went out there voluntarily?

"A. Yes, sir.

"Q. All right. Well, why did you do it? Did you go just to have a good time?

"A. No, sir.

"Q. Why?

"A. Because they stressed the fact so much that they wanted 100 per cent there, and I just felt like it was necessary for me to go.

"Q. All right.

"A. The way they put it—brought it around for us to go.

"Q. Who did?

"A. The management.

"Q. And who, specifically?

"A. Mr. Gregory, Mr. Chapman, Mr. Warren, and the new car sales manager, and also, Mr. McAlister.

"Q. All right. Were they fairly insistent about it?

"A. Yes, sir."

The witness Gladys Davis testified in part:

"Q. What are the facts, if any, with which you are familiar with regard to whether or not the company was insistent upon the employees being at that picnic?

"A. They asked everyone to go, for public relations and purposes—for employee relations.

"Q. All right. And did they have a good turn out?

"A. Very good.

"Q. Do you remember if they had a high percentage of the salesmen there?

"A. As far as I know, they were all there."

A fellow salesman, Louis D. Wallace, testified concerning compulsory attendance at the company picnic, as follows:

"Q. And did anyone, in a managerial capacity over at McAlister, have any conversations with you about the picnic in the week or so before it was put on?

"A. Well, it was discussed, yes. I would say they did.

"Q. All right. State the facts as to whether or not the management was energetic in pushing this picnic?

"A. Well, they were pretty energetic in trying to get people to come, you mean?

"Q. Yes.

"A. Yes, sir.

"Q. Were they particularly interested in the salesmen, or could you tell?

"A. I wouldn't be able to say, exactly. I think they wanted everyone to attend.

"Q. All right. Were they fairly insistent, in your knowledge, as to the attendance at the picnic?

"A. Well, I will say this: I attended because I felt like it was in my best interests as an employee to attend. I felt like, the way it was promoted and all, it might be damaging, as they—my image as an employee, if I didn't show up. I wasn't particularly wanting to go that day, but I went, anyway, on that account.

"Q. I see. You felt like, in other words, it would hurt you, as an employee, if you didn't go?

"A. I thought there was a possibility of that, yes."

The witness Cagle, the service manager, testified that he took the new model automobile to the picnic grounds so that the employees' wives who hadn't seen the new car would have an opportunity of looking at it to see what they would have the next year. He said that this automobile was the first model that had a peculiar back window and that the salesmen needed to be familiarized with this innovation; that they needed to be sold on the idea that it was a good selling point for the automobile. He testified that the picnic was a social function designed to improve relations and build a better organization which would inure to the benefit of McAllister Mercury-Comet, Inc.

The witness T. V. Gregory, used car manager, testified that the picnic was designed to promote a more efficient operation which, he admitted, makes ultimately more profit for the company.

The witness Buffington, testifying for the defendant, said he was a salesman working on a commission and that he attended the company picnic. His testimony in this regard was:

"Q. Did you go to the picnic?

"A. I did.

"Q. All right, sir. Did you go because you wanted to, or because you had to?

"A. Well, here is—The company spent the money, and of course, I'm not—I'm just speaking for myself, but my wife and I felt that we wasn't—It wasn't compulsory for us to go, but we felt like we were obligated to go.

"Q. All right. Did you conduct any business out there, sir?

"A. Pardon me?

"Q. Was there any business conducted out there, that you know about?

"A. Well, I steered a customer out there, is the only thing I can tell you.

"Q. Who was that?

"A. I forgot his name.

"Q. All right. Was he an employee, or not?

"A. No, he wasn't an employee."

On cross-examination he reiterated that he thought that he and his wife were obligated to go to the picnic because the company had been nice to them. He said:

"Q. You considered that picnic as good a place as anywhere else to conduct business, though, if you got a chance, didn't you?

"A. That is right."

■ When we apply the test, stated above, to the entire record in this case, and especially to the quoted portions thereof, we are of the opinion that there is clearly evidence of probative force to support the submission to the jury of the special issue on course and scope of employment. While we do not hold that under the peculiar facts in this case Clevenger was acting within the course and scope of his employment at the time he sustained his injuries, as a matter of law, we do hold that the evidence presented does not compel the opposite finding, as a matter of law. We hold that under the record here made there was sufficient evidence of probative force to justify the court in submitting, as he did in the first instance, the issue on course and scope of employment, accompanied by appropriate instructions defining such term. Kelty v. Travelers Ins. Co., Tex.Civ.App., 391 S.W. 2d 558, 565.

Art. 8309, Sec. 1(4), Vernon's Ann.Civ. St. defines an injury received within the scope and course of the employee's employment as being: "* * * all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere." The legitimate question presented here is whether the picnic, when considered in its entirety, was an activity "having to do with and originating in" the employer's business. We think that when the testimony is viewed as a whole that reasonable minds could very well differ on this question and therefore the issue became one for the jury's consideration.

■ While scores of opinions have been written and published on varying kinds of factual situations involving workmen's compensation claims growing out of injuries sustained by employees engaged in recreational or social activities outside the premises of the employer, we believe that Pro-

fessor Larson in his work on "Workmen's Compensation" has correctly stated the rule applicable, as follows:

§ 22.00. Recreational or social activities are within the course of employment when

"(1) They occur on the premises during a lunch or recreation period as a regular incident to the employment; or

"(2) The employer, by expressly or impliedly requiring participation, or by making the activity part of the services of an employee, brings the activity within the orbit of the employment; or

"(3) The employer derives substantial direct benefit from the activity beyond the intangible value of improvement in employee health or morale that is common to all kinds of recreation and social life."

The above quoted testimony illustrates that a factual situation was presented as to whether the employer in this case expressly or impliedly required the attendance and participation of Clevenger at the picnic in question. As Professor Larson says at § 22.22:

"If the activity although not an integral part of the job is in effect required, it is clear enough that the employer has brought that activity within the employment. * * * The compulsion need not take the form of a direct order if the employee is made to understand that he is to take part in the affair."

The situation involving implied compulsion to attend recreational activity, such as here, is typified in the case of Employers Mutual Liability Ins. Co. v. Sanderfer, Tex. Civ.App., 382 S.W.2d 144 in which the employee testified that while he was not forced or compelled to go on the hunting trip during which he was injured, he said that his boss "told me it would be a good idea for me to go * * *. He didn't chase me up there. He told me it would be a good idea

for me to go." Compensation was awarded the employee because the hunting trip was found to be in the "furtherance of the affairs or business of the employer."

■ We believe that our decision here is in accord with the clear mandate that the Workmen's Compensation Act is to be liberally construed and that the issue of course and scope of employment is ordinarily an issue of fact for the determination of a jury. Shelton v. Standard Ins. Co., Tex. Sup.Ct., 389 S.W.2d 290; Janak v. Texas Employers Ins. Ass'n, Tex.Sup.Ct., 381 S.W.2d 176; and Jecker v. Western Alliance Ins. Co., Tex.Sup.Ct., 369 S.W.2d 776.

Appellee, and apparently the trial court, relied chiefly upon the case of Campbell et al. v. Liberty Mutual Ins. Co., Tex.Civ.App., 378 S.W.2d 354, being the only other Texas reported case dealing with the specific question of injuries sustained by an employee while attending a company picnic. While we agree completely with the opinion of the Court of Civil Appeals at Eastland in the Campbell case, we find that it is not authoritative of the issue here presented. That appeal was from a summary judgment. The motion for summary judgment by the insurance company was supported by affidavits which were clear and express in their terms relating to the facts and circumstances of the death of the employee in that case while attending a company picnic. The affidavits established that attendance by employees was not compulsory; that no customers were present; that no business was conducted or intended to be conducted; and that the employee was not asked to perform any service for his employer at said gathering. The verified motion and affidavits attached thereto were never controverted and the trial court sustained the motion. Under that factual situation no issue was presented and the court correctly sustained the motion. This is not the situation in the instant appeal where the case was fully tried and conflicting evidence was presented, as above related.

Appellant's Points 2, 3 and 4 are sustained.

In his supplemental brief appellant has presented his fifth point of error in which he contends that the trial court erred in overruling his motion for summary judgment. As above related, appellant's motion for summary judgment was not filed nor presented to the court until several months following the trial of the case and long after the jury had been discharged but no order of mistrial had been entered. The motion for summary judgment was supported by a lengthy affidavit of Clevenger as well as answers to requests for admissions of fact. No counter affidavits were filed in opposition to this motion. We agree with appellee that the action of the court in overruling the motion does not constitute error.

In the first place, we do not believe that appellant's motion for summary judgment was timely filed. While it was made under the provisions of Rule 166–A, T.R.C.P., and such rule does provide that a motion for summary judgment may be made "at any time after the adverse party has appeared or answered," said rule is a part of Rule 166, T.R.C.P., which governs pre-trial procedures and appears in a section of the rule designated as "Section 8— Pre-Trial Procedure." Said Rule 166–A, T.R.C.P. is modeled substantially after Rule 56 of the Federal Rules of Civil Procedure. Since the Texas rule is modeled on the federal rule we believe that federal decisions construing the purposes for engrafting a summary judgment technique into American jurisprudence are relevant. We find numerous federal cases reflecting the idea that the practice was designed to enable the trial court to make prompt disposition of lawsuits which by their very nature were susceptible of conclusion in summary fashion, without the necessity of resorting to all the procedures involved in a plenary trial. New Hampshire Fire Ins. Co. v. Scanlon, 362 U.S. 404, 80 S.Ct. 843, 4 L.Ed.2d 826; Sartor v. Arkansas Natural Gas Corp., 5th Circuit, 134 F.2d 433; Whitaker v. Coleman, 5th Circuit, 115 F.2d 305; Securities & Exchange Commission v. Payne, Dist.Ct., Southern District, New York, 35 F.Supp. 873.

McDonald, in his treatise, "Texas Civil Practice," Cumulative Supplement, Vol. 4, § 17.26.2, concludes that under the provisions of Rule 166–A of the Texas Rules of Civil Procedure, said motion should be filed and called to the attention of the court "in advance of trial." Of course, the trial court may defer until a later time his disposition of the motion timely filed. This is often done, as illustrated by the decision of the Fifth Circuit in Woods v. Robb, 171 F.2d 539.

The very essence of the summary judgment rule is to avoid the necessity of a trial on the merits. To say that a motion may be timely filed after the case has been completely tried before a jury is to defeat the very purpose of the rule.

However, and assuming *arguendo*, that the motion was timely filed, we are of the opinion that the trial court was justified in overruling same because the record brought before the court, which included all of the testimony given, and especially the portion outlined above, demonstrated the existence of controverted facts which would defeat the granting of the motion. The absence of controverting affidavits is not mandatory if there are other matters of record sufficient to establish that said motion is not well taken. Ragsdale v. McLaughlin, Tex.Civ.App., 285 S.W.2d 467; Freeberg v. Securities Investment Co. of St. Louis, Tex. Civ.App., 331 S.W.2d 825; Simpson v. City of Abilene, Tex.Civ.App., 388 S.W.2d 760; Willoughby v. Jones, 151 Tex. 435, 251 S.W.2d 508; McKay v. Dunlap, Tex.Civ. App., 244 S.W.2d 278; Pridgen v. Denson, Tex.Civ.App., 298 S.W.2d 276; Boroughs v. Williamson, Tex.Civ.App., 330 S.W.2d 638.

In Burnham Chemical Co. v. Borax Consolidated, 9th Circuit, 170 F.2d 569 the trial judge waited until after the introduction of

testimony before sustaining a motion for summary judgment. The court held that the trial judge was authorized and should have considered the testimony in the record, as well as affidavits of the parties attached to said motion, in arriving at his judgment.

The complete record before the court demonstrated issuable facts on the question of course and scope of employment and therefore the trial judge was justified in overruling appellant's motion for summary judgment. Appellant's fifth point is overruled.

The judgment of the trial court is reversed and remanded.

Reversed and remanded.